IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

WINSTON GAILLARD, etc.,          )
                                 )
        Plaintiff,               )
                                 )
v.                               )          CIVIL ACTION 12-0228-WS-N
                                 )
CITY OF SATSUMA, et al.,         )
                                 )
        Defendants.              )

## ORDER

This matter is before the Court on the defendants' motions for summary judgment.  (Docs. 25, 26).  The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 25, 27-30, 33, 35-37, 40-42), and the motions are ripe for resolution.  After careful consideration, the Court concludes that the City's motion is due to be granted and that Commins' motion is due to be granted in part and denied in part.

## BACKGROUND

According to the first amended complaint, (Doc. 2, Exhibit 80 at 899-905), the plaintiff's decedent ("Jermaine") was a passenger in a vehicle driven by Hillary Baldwin on July 29, 2008.  Baldwin's vehicle was being pursued by law enforcement vehicles from three different jurisdictions.  Once Baldwin's vehicle was stopped, Jermaine exited and ran across the road, in the course of which Officer Commins of the Satsuma Police Department ("the Department") ran him over, killing him.  The defendants are Commins and the City of Satsuma ("the City").[1]  The four counts, each asserted against both defendants, allege state

_____

[1] The style of the amended complaint reads, "City of Satsuma; Officer Samuel Peter Commins; of the City of Satsuma Police Department, et al., Defendants."  (Doc. 2,

claims of negligence and wrongful death; state constitutional claims under Section 1983; and federal constitutional claims under Section 1983.  The plaintiff concedes that the City is entitled to summary judgment with respect to the Section 1983 claims.  (Doc. 36 at 12, 22, 24).

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. [citation omitted] In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc)

---

Exhibit 80 at 899).  Despite this unfortunate wording, it is clear from the amended complaint that the Satsuma Police Department is not a defendant and that there no other defendants.  No party argues otherwise.

(emphasis in original); *accord Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick*, 2 F.3d at 1116; *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

There is no burden on the Court to identify unreferenced evidence supporting a party's position. Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited. Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Resolution Trust Corp. v. Dunmar Corp*., 43 F.3d 587, 599 (11th Cir. 1995), and the Court accordingly limits its review to those arguments the parties have expressly advanced.

## I. Federal Claims.

Count Four alleges that Commins violated Jermaine's Fourth Amendment right to be free of unreasonable searches and seizures, due to the application of excessive force.  Count Three asserts a welter of other constitutional claims.  (Doc. 2, Exhibit 80 at 903-04).

### A. Excessive Force.

 "The Fourth Amendment's [right to] freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest."  *Brown v. City of Huntsville*, 608 F.3d 724, 737 (11th Cir. 2010) (internal quotes omitted).  Commins denies that any seizure occurred or that any constitutional violation occurred.  Commins argues further that he is entitled to qualified immunity as to any constitutional violation.  (Doc. 29 at 17-22).

#### 1. Seizure.

 "The Fourth Amendment covers only searches and seizures …."  *County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) (internal quotes omitted).  "A Fourth Amendment seizure occurs when there is a governmental termination of freedom of movement through means intentionally applied."  *Beshers v. Harrison*, 495 F.3d 1260, 1265 (11th Cir. 2007) (internal quotes omitted); *see also Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("[T]here can be no doubt that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.").  Thus, "if a police cruiser pulls alongside a fleeing car and sideswipes it, thereby producing a crash, a seizure occurs."  *Beshers*, 495 F.3d at 1265-66.  But "no Fourth Amendment seizure would take place where a pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit, but accidentally stopped the suspect by crashing into him."  *Lewis*, 523 U.S. at  844 (internal quotes omitted).

Commins argues that no seizure occurred, on the grounds that he struck Jermaine by accident.  (Doc. 29 at 18).  After reviewing the video recording made from Commins' vehicle, (Doc. 37, Exhibit 5), and other evidence identified by the plaintiff, the Court concludes that a genuine issue of material fact exists as to whether Commins deliberately ran over Jermaine for the purpose of preventing his escape, thereby effecting a seizure.

The video shows Jermaine plainly visible in a white T-shirt, running along Bay Bridge Road from Commins' right to his left and beginning to cross the service road on which Commins was traveling, well in front of Commins. Commins admits he had seen Jermaine by this point.  (Commins Deposition at 83, 85).  The video shows Jermaine running at least nine strides before being struck, and it shows Commins turning his vehicle softly to the left (the direction of Jermaine's travel), all but ensuring a direct strike.  Commins admits that he accelerated before striking Jermaine, and he admits he did not apply the brakes until after striking him.  (Commins Deposition at 83-84).  There is evidence that Commins was traveling 22 miles per hour as he entered the intersection and that he was traveling 27 miles per hour at the point of impact.  (Sasso Deposition at 78-79).

Commins asserts that Jermaine tripped and began to fall just before being struck by the police vehicle, but the video can reasonably be viewed as reflecting that Jermaine fell only when struck.  At any rate, the video supports a reasonable inference that Commins would have struck Jermaine even had he not stumbled.

There is also evidence that the collision was not inevitable but could have been avoided by Commins had he tried to do so by braking and/or swerving. (Sasso Deposition at 77).  The vehicle's relatively slow speed as it entered the intersection, and the space between the vehicle and Jermaine at that point, support this view.  That Commins attempted neither braking nor swerving but, on the contrary, accelerated and turned his vehicle directly into Jermaine's path, is

5

consistent with an intentional application of force to stop Jermaine and thus a seizure.

Commins urges the Court to follow *Beshers*, in which the Eleventh Circuit rejected the plaintiff's version of events "to the extent [that version] is clearly contradicted by the videotapes, such that no reasonable jury could believe it." 495 F.3d at 1262 n.1. As discussed above, however, the plaintiff's version is not contradicted by the video evidence but supported by it. Commins mounts no argument to the contrary.

For the reasons set forth above, Commins is not entitled to summary judgment on the plaintiff's Fourth Amendment claim for want of a seizure.

### 2. Constitutional violation.

"[A]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness standard …." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis omitted). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396 (internal quotes omitted). "[P]roper application [of the reasonableness test] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. Moreover, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. Finally, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments –

in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id*. at 396-97.

Commins acknowledges that he applied deadly force. (Doc. 29 at 20-21). In applying the Fourth Amendment's balancing test, "[t]he intrusiveness of a seizure by means of deadly force is unmatched. The suspect's fundamental interest in his own life need not be elaborated upon. The use of deadly force also frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). The individual's side of the Fourth Amendment scale is thus at its very weightiest when deadly force is applied, such that both the countervailing governmental interest and the attendant circumstances must be correspondingly weighty in order to tilt the scale in the defendant's favor.

Commins suggests he struck Jermaine in order to avoid striking others, rather than in order to seize Jermaine. (Commins Deposition at 83, 86). As noted in Part I.A.1, however, the evidence presented would allow a jury to find that Commins struck Jermaine in order to seize him. Therefore, for purposes of this motion the Court must limit the countervailing governmental interest at stake to that of preventing a felony suspect from escaping.

"The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Garner*, 471 U.S. at 11. Commins, invoking the circumstances found relevant in *Graham*, asserts – though without any analysis, authority or argument – that his use of deadly force to prevent Jermaine's escape was constitutionally reasonable due to the severity of the crime of which Jermaine and Baldwin were suspected, their past and continuing efforts to evade arrest by flight, and the danger posed by the car chase. In addition, he points to the suspects' criminal history. (Doc. 29 at 21-22; Doc. 41 at 8).

Before addressing these circumstances, the Court must point out that the freedom of a law enforcement officer to employ deadly force in order to prevent

escape has been restricted by *Garner*. "This case requires us to determine the constitutionality of the use of deadly force to prevent the escape of an apparently unarmed suspected felon. We conclude that such force may not be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." 471 U.S. at 3.[2]

The Supreme Court in *Garner* repeatedly drove home the central proposition that the use of deadly force to stop a fleeing suspected felon is constitutionally unjustified unless the suspect is armed or the officer has probable cause to believe the suspect otherwise poses a sufficient danger to the officer or to others. For example, "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." 471 U.S. at 11. Similarly, "we are not convinced that the use of deadly force is a sufficiently productive means of accomplishing [the government's law enforcement] goals to justify the killing of nonviolent suspects," *id*. at 10, and "[p]etitioners and appellant have not persuaded us that shooting nondangerous fleeing suspects is so vital as to outweigh the suspect's interest in his own life." *Id*. at 11. Thus, "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead," and a statute authorizing deadly force against such a fleeing suspect "is unconstitutional" to that extent. *Id*. On the flip side, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id*. For example, "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be

---

[2] The threat required by *Garner* is an "immediate threat." *Vaughan v. Cox*, 343 F.3d 1323, 1330, 1332 (11th Cir. 2003). This is consistent with *Graham*, which focuses on "whether the suspect poses an immediate threat to the safety of the officers or others." 490 U.S. at 396.

used if necessary to prevent escape," at least if any feasible warning has been given.  *Id*. at 11-12.

Commins argues that, in light of *Scott v. Harris*, 550 U.S. 372 (2007), *Garner* no longer applies.  (Doc. 29 at 21).  The *Scott* Court did rule that "*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'"  550 U.S. at 382.  Instead, "*Garner* was simply an application of the Fourth Amendment's 'reasonableness' test … to the use of a particular type of force in a particular situation."  *Id*. at 382.  This is no doubt correct, but the "particular situation" which *Garner* addresses is "the flight on foot of an unarmed suspect," *id*. at 383, which is the situation presented here.  *Garner* thus applies.[3]

The video shows that Jermaine was wearing a T-shirt and shorts and that he had no weapon in either hand.  Moreover, the exhaustive internal investigation report and attachments contain no hint that Jermaine was armed.  (Doc. 27, Exhibit 8).  Commins admits that Jermaine "wasn't brandishing a weapon, putting a third party at risk [or] another officer at risk."  (Commins Deposition at 93).  This case

---

[3] *Scott* involved a motorist, not a pedestrian.  Even in this context, the *Scott* Court did not hold that the use of deadly force to stop a fleeing suspect could be justified absent any threat of harm posed by the suspect; instead, the Court relied on the "substantial and immediate risk of serious physical injury to others" posed by the plaintiff's high-speed flight.  550 U.S. at 386.

Eleventh Circuit cases applying *Scott* likewise have found such a threat of physical harm when upholding the application of deadly force.  *See Terrell v. Smith*, 668 F.3d 1244, 1249, 1254-55 (11th Cir. 2012) (where the plaintiff's decedent was shot by a pedestrian officer as he attempted to drive away, "at least three individuals … faced the immediate and utterly foreseeable risk of being struck by Zylstra's fleeing car"); *Penley v. Eslinger*, 605 F.3d 843, 851 (11th Cir. 2010) (where the decedent brought a realistic plastic gun to school and refused to drop it when commanded, he posed a "grave danger"); *Sharp v. Fisher*, 532 F.3d 1180, 1184 (11th Cir. 2008) (the decedent's high-speed motor vehicle flight "posed a substantial and immediate risk of serious physical injury to others"*); Beshers*, 495 F.3d at 1268 (similar); *Long v. Slaton*, 508 F.3d 576, 581-82 (11th Cir. 2007) (the mentally unstable decedent's conduct in taking control of a police cruiser and beginning to drive it made him appear "gravely dangerous").

is thus like *Garner*, where the defendant "saw no sign of a weapon and, though not certain, was 'reasonably sure' and 'figured' that [the suspect] was unarmed." 471 U.S. at 3. "Restated in Fourth Amendment terms, this means [the defendant] had no articulable basis to think [the suspect] was armed." *Id*. at 20. Thus, as in *Garner*, the suspect was "apparently unarmed," and the use of deadly force to prevent his escape was constitutionally permissible only if Commins "ha[d] probable cause to believe that [Jermaine] pose[d] a significant threat of death or serious physical injury to [Commins] or others." *Id*. at 3.

With this proper context in mind, the Court now turns to Commins' argument that the severity of the crime of which Jermaine and Baldwin were suspected; their efforts to evade arrest by flight; the danger posed by the car chase; and/or their criminal history made it constitutionally reasonable to kill the unarmed Jermaine to prevent his escape. The relevant inquiry is whether these matters furnished Commins with probable cause to believe that Jermaine, although unarmed, nevertheless posed the requisite threat to Commins or to others.

The starting point of this inquiry must be Commins' own testimony. As noted, Commins concedes that Jermaine "wasn't … putting a third party at risk, another officer at risk." (Commins Deposition at 93). Because "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them," *Graham*, 490 U.S. at 397, Commins' admission that the facts and circumstances confronting him reflected no threat to anyone weighs heavily against him.

Jermaine and Baldwin were suspected of being in the process of transporting two to three kilograms of cocaine from Atlanta to Mobile. (Burch Affidavit at 2-3). Commins did not know the quantity involved, but Sergeant Guy had informed him "that there was some dope coming southbound on 65." (Commins Deposition at 57, 69-70). For present purposes, the Court assumes

Commins understood that Jermaine and Baldwin were suspected of conspiring to possess cocaine with intent to distribute.[4]

As noted, *Graham* includes "the severity of the crime at issue" in the calculus of the reasonableness of the force employed. But in the deadly force context, the relevant characteristic of the crime is not some abstract notion of severity but whether that crime portends a real risk of impending violence sufficient to justify death as a prophylactic measure. The crime at issue in *Garner* was burglary, which the Supreme Court acknowledged to be "a serious crime," yet the Court said it "cannot agree that it is so dangerous as automatically to justify the use of deadly force." 471 U.S. at 21. Thus, despite the defendant's awareness that the decedent was a burglary suspect, he "did not have probable cause to believe that Garner, whom he correctly believed to be unarmed, posed any physical danger to himself or others." *Id.*

A crime "involving the infliction or threatened infliction of serious physical harm" will support probable cause to employ deadly force. *Garner*, 471 U.S. at 11. In such a case, the suspect's "mere being at large poses an inherent danger to society." *Scott*, 550 U.S. at 382 n.9. Commins does not suggest that Jermaine's act of transporting cocaine involved the actual or threatened infliction of serious physical harm, and nothing in the record even remotely suggests that Jermaine or Baldwin had engaged in violence, or had threatened to engage in violence, incident to their drive from Atlanta.[5] The crime of which Jermaine and Baldwin

---

[4] This is the charge on which Baldwin was indicted and to which he pleaded guilty. (Doc. 27, Exhibit 7 at 11-12, 34).

[5] The connection between drug trafficking and violence depends on the presence of weapons. *E.g., United States v. Lopez*, 649 F.3d 1222, 1242 (11th Cir. 2011) ("Guns and violence go hand-in-hand with illegal drug operations.") (internal quotes omitted). Just as an armed burglar "would present a different situation," *Garner*, 471 U.S. at 21, an armed drug dealer would as well. But, as already discussed, there is evidence that Jermaine was unarmed, that he was obviously unarmed, and that Commins realized he was unarmed.

were suspected does not support the existence of probable cause to believe Jermaine posed a significant and immediate threat of death or serious physical injury.

Commins next relies on the fact that Jermaine was attempting to elude capture when he was struck by Commins' vehicle. That fact, however, merely sets the stage for the constitutional analysis; it does not constitute a factor supporting Commins' application of deadly force to prevent escape, any more than did the flight of the unarmed burglary suspect in *Garner*.

Commins also points to the danger posed by the suspects' recent high-speed flight from pursuing law enforcement vehicles. Had Commins or another officer employed appropriate means to force Baldwin's vehicle to stop, thereby protecting the lives of citizens and the officers, and had Baldwin or Jermaine been injured or killed in the attempt, such action might well have proved constitutionally reasonable, under the reasoning of *Scott* and like cases.[6] But the danger posed by Baldwin's driving completely ended when his vehicle stopped, and Commins cannot rely on that past, historical danger to justify his later use of deadly force. *Garner* requires that there be a present threat of serious physical harm, and nothing about the car chase suggested that a running, unarmed Jermaine posed such a present threat. Nor can Baldwin's reckless driving be treated as an underlying crime involving the infliction or threatened infliction of serious physical harm, since the *Scott* Court ruled that the plaintiff's high-speed flight "did not pose that type of inherent threat to society" demanded by *Garner*'s focus on crimes involving the actual or threatened infliction of serious physical harm. 550 U.S. at 382 n.9.

Finally, Commins points to the suspects' criminal history. Although *Garner* did not mention this as a factor, the *Scott* Court noted that, "so far as the police

---

[6] *See Scott*, 550 U.S. at 382 n.9 ("[I]t was respondent's flight itself (by means of a speeding automobile) that posed the threat of 'serious physical harm … to others.'") (quoting *Garner*, 471 U.S. at 11).

were aware, [the plaintiff] had no prior criminal record." 550 U.S. at 382 n.9. The Court thus assumes that criminal history could in a proper case provide probable cause to believe that a particular suspect poses the requisite threat of death or serious physical injury if allowed to escape.

The threshold problem with Commins' argument is that, when he struck Jermaine, he had no idea what criminal history, if any, Jermaine or Baldwin had. (Commins Deposition at 69-72, 75-76; Doc. 41 at 3-4). Commins says this is immaterial because officers from other participating jurisdictions were aware of this history, and their awareness is imputed to him. (*Id.*).

"Where there is at least minimal communication between different officers, the collective knowledge of the officers determines probable cause." *United States v. Allison*, 953 F.2d 1346, 1350 (11th Cir. 1992); *accord Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010) ("Probable cause may exist based on the collective knowledge of law enforcement officials derived from reasonably trustworthy information."). Commins was in communication only with Sergeant Guy, and that minimally. There is no evidence that Sergeant Guy was aware of the suspects' criminal histories, but there is evidence that, at least prior to his joinder in the pursuit, he had been in at least minimal communication with one or more other participating officers. Though far from clear, the Court will assume for present purposes that the evidence supports the "minimal communication" prerequisite for invoking the collective knowledge rule.

But in the cases noted above and in others cited by Commins, at issue was probable cause to search or arrest, not the reasonableness of a decision to use deadly force to effect an arrest (as measured by the existence of probable cause to believe the suspect posed a significant and immediate threat of death or serious physical injury). This is not an idle distinction. As noted, the intrusion visited by death is "unmatched" and irreversible. A rule that would allow defendants to kill unarmed, nondangerous fleeing suspects with impunity so long as – unknown to the defendant – some other involved officer happens to have information about the

suspect's criminal history would only encourage such intrusions, with resulting unconstitutional deprivations of life when it turns out that no involved officer had such information.  Commins has offered no authority supporting his argument and no explanation why the Court should embrace such a perverse result.  As discussed below, the case law is contrary to his position.

First, the *Graham* Court requires that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  490 U.S. at 396.  To credit Commins with information he did not possess is to violate this requirement, shifting the focus from the perspective of a reasonable officer on the scene to the 20/20 vision of hindsight.

Second, the Eleventh Circuit has confirmed that whether an officer's employment of deadly force was objectively reasonable "must be evaluated from the perspective of a reasonable officer possessing the same particularized information as the subject officer."  *Penley v. Eslinger*, 605 F.3d 843, 852 (11th Cir. 2010) (internal quotes omitted).  The particularized information Commins possessed when he struck Jermaine did not include information concerning the suspects' criminal history.

Finally, the Second Circuit has directly considered and rejected Commins' argument.  In *Little v. Davis*, 851 F.2d 605 (2nd Cir. 1988), the suspect had escaped from a police car by assaulting his captors.  The officer who re-captured the suspect (by shooting him several times) knew nothing of this assault but argued such knowledge should be attributed to him for purposes of the *Garner* analysis. *Id*. at 606-07.  The Second Circuit disagreed, holding that "[t]he collective knowledge of the police may bear directly on the legality of a decision to arrest a suspect, but reasonableness [of the decision to use deadly force to effect the arrest] is to be determined in reference to the specific circumstances, acts, and individuals involved in effecting the arrest."  *Id*. at 607.  Thus, "the magistrate was perfectly correct in looking at the circumstances as a person in [the defendant's] shoes saw

them, as opposed to considering all the information that all the other officers possessed, in determining whether [the defendant's] conduct was reasonable" under *Garner*.

For these reasons, the Court concludes that Commins cannot rely on the suspects' unknown criminal history to establish probable cause to believe Jermaine posed the requisite threat of death or serious physical injury.[7]

Even were awareness of the suspects' criminal history to be imputed to Commins, it would not establish the necessary probable cause to believe that Jermaine posed the requisite threat of violence. Most of that history involves drug offenses,[8] which adds nothing to what Commins already knew. Baldwin has not been shown to have had any violent criminal history at all. Jermaine's only conviction of a crime of violence was for manslaughter, for which he was arrested in June 1994. (Doc. 27, Exhibit 8 at 81). It strains credulity to suggest that, because Jermaine once killed someone either recklessly or in the heat of passion,[9] he posed to others a significant and immediate threat of death or serious physical injury on a specific day over 14 years later, while on foot and unarmed. Commins presents no argument or authority to the contrary.[10]

---

[7] The collective knowledge rule is sometimes invoked where the arresting officer has no personal information but has been directed to effect the seizure by others who do have such knowledge. *E.g., United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998). An officer who is directed to apply deadly force perhaps could rely on collective knowledge in such a situation, since he has been given some basis for employing deadly force. Here, however, Commins acted completely on his own in using deadly force.

[8] (Doc. 27, Exhibit 7 at 17; *id*., Exhibit 8 at 80-94).

[9] Ala. Code § 13A-6-3.

[10] Jermaine was convicted in 1991 of menacing, (Doc. 27, Exhibit 8 at 80), which indicates he "intentionally place[d] or attempt[ed] to place another person in fear of imminent serious physical injury." Ala. Code § 13A-6-23. This conduct is even more remote, and it involves no actual violence. It cannot support probable cause to believe Jermaine posed a threat of serious violence on a specific day some 17 years later.

15

Even if Commins had possessed probable cause to believe that Jermaine posed a significant and immediate threat of death or serious physical injury if allowed to escape, his use of deadly force to effect a seizure would be unconstitutional under *Garner* unless he "reasonably believe[d] that the use of deadly force was necessary to prevent escape." *Vaughan v. Cox*, 343 F.3d 1323, 1329-30 (11th Cir. 2003). By Commins' own count, three other officers (from the police vehicles arriving before him) were already hot on the heels of Jermaine and Baldwin, who were running along Bay Bridge Road, a four-lane paved thoroughfare. (Guy Affidavit at 3; Eiland Affidavit at 3; Gifford Affidavit at 2; Doc. 41 at 7). Indeed, Baldwin was apprehended on Bay Bridge Road. (Guy Affidavit at 3). As in *Vaughan*, a properly functioning jury could find that the use of deadly force was not necessary to prevent Jermaine from escaping capture.

For the reasons set forth above, Commins is not entitled to summary judgment on the plaintiff's Fourth Amendment claim for want of a constitutional violation.

### 3. Qualified immunity.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority." *Harbert International, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998). The burden then shifts to the plaintiff to show that the defendant's conduct "violated a clearly established statutory or constitutional right." *Grayden v. Rhodes*, 345 F.3d 1225, 1231 (11th Cir. 2003). As discussed below, Commins has failed to carry his initial burden, and his bid for qualified immunity must therefore fail.

"[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. ...  If, and only if, the defendant does that will the burden shift to the plaintiff to establish that the defendant violated clearly established law." *Harbert International*, 157 F.3d at 1281 (emphasis added).  The reason is that an official acting outside the scope of his discretionary authority "ceases to act as a government official and instead acts on his own behalf," so that "the policies underlying the doctrine of qualified immunity no longer support its application." *Id*.

For purposes of federal qualified immunity analysis, a defendant acts within his discretionary authority when "his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988) (internal quotes omitted).  For this inquiry, "[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

The first prong of this test requires that the defendant "have been performing a function that, but for the alleged unconstitutional infirmity, would have fallen within his legitimate job description." *Holloman*, 370 F.3d at 1266 (emphasis omitted).  "The inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act," but "whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Harbert International*, 157 F.3d at 1282 (internal quotes omitted).[11]

---

[11] For example, the issue is not whether a marshal has the authority to deliver a prisoner into unconstitutional conditions but whether he has the authority to transport and deliver prisoners.  *Harbert International*, 157 F.3d at 1282 (describing *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994)).

As for the second prong, "[e]ach government employee is given only a certain 'arsenal' of powers with which to accomplish her goals." *Holloman*, 370 F.3d at 1267. "Pursuing a job-related goal through means that fall outside the range of discretion that comes with an employee's job is not protected by qualified immunity." *Id*.

"[A] government official can prove he acted within the scope of his discretionary authority by showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Roberts v. Spielman*, 643 F.3d 899, 903 (11th Cir. 2011) (internal quotes omitted). The Court must "interpre[t] the evidence in the light most favorable to the plaintiff." *Townsend v. Jefferson County*, 601 F.3d 1152, 1158 (11th Cir. 2010). The quantum and quality of evidence necessary to meet the defendant's burden "vary in proportion to the degree of discretion inherent in the defendant's office," *Harbert International*, 157 F.3d at 1282 (internal quotes omitted), but ordinarily "there must be a showing by competent summary judgment materials of objective circumstances that would compel th[e] conclusion" that the defendant acted within his discretionary authority. *Id*. (internal quotes omitted). Certainly "[a] bald assertion that the acts were taken pursuant to the performance of duties and within the scope of duties will not suffice" to meet the defendant's burden of proof. *Id*. (internal quotes omitted).

Commins' entire effort to satisfy his burden of showing that he was acting within his discretionary authority consists of the unadorned assertion in his brief, parroting *Rich*, that his actions "were undertaken pursuant to the performance of his duties and within the scope of his authority as an officer for the Satsuma Police Department." (Doc. 29 at 11). This non-evidentiary ipse dixit is but a "bald assertion," inadequate to meet Commins' threshold burden. While it may be assumed that pursuing and arresting suspects, including by employing deadly force, generally falls within a police officer's legitimate job description, it is far

from obvious that Commins did so through means that were within his power to utilize.

Although the plaintiff is under no burden to disprove that Commins was acting within his discretionary authority, he has identified several points that raise legitimate questions in that regard. First, Commins was off duty at the time of the vehicle pursuit and use of force. (Commins Deposition at 57).[12] Second, Commins was acting outside the corporate limits of the City; indeed, he applied force at the boundary between the cities of Prichard and Mobile, several jurisdictions beyond Satsuma.[13] Third, the Department has a written policy governing vehicle pursuits, which includes the following language:

> A unit may become directly involved in the pursuit [initiated by another police agency, as was the pursuit of Baldwin and Jermaine] if authorized by the supervisor as long as the pursuit remains within our corporate limits. To continue outside of our corporate limits, authorization to do so must be received from the supervisor.

(Doc. 37, Exhibit 4 at 4). Commins was required by his employer to act "in strict accordance" with this policy. (*Id*. at 1). Commins, who ignores the policy, has failed at several points to demonstrate that it was satisfied.

First, the policy requires that, in order to participate in a vehicle pursuit not initiated by the Department, Commins must have been authorized to do so by "the supervisor," defined as "[t]he on duty patrol shift watch commander." (Doc. 37, Exhibit 4 at 1). The only person with whom Commins had any contact was Sergeant Guy, (Commins Deposition at 68-69), so the question is whether Guy was the on duty patrol shift watch commander at the relevant time.

---

[12] *See Courson v. McMillian*, 939 F.2d 1479, 1488 (11th Cir. 1991) (relying on the defendant's "on duty" status in concluding he was acting within his discretionary authority); *German v. Sosa*, 399 Fed. Appx. 554, 555 (11th Cir. 2010) (same). An off-duty officer may still act within his discretionary authority, but that circumstance calls for an explanation, which Commins does not provide.

[13] In order from north to south lie the incorporated municipalities of Satsuma, Saraland, Chickasaw, Prichard and Mobile.

Commins has not addressed this requirement or whether it was satisfied. Nevertheless, the Court has reviewed his deposition to see if it resolves the question. Commins testified that Sergeant Guy was the oncoming supervisor when Commins went off duty. (Commins Deposition at 57, 67). But Commins explained that Guy was his supervisor because "[h]e was the only one on shift that was a sergeant," (*id*. at 67), not because he was the patrol shift watch commander. Commins identified Lieutenant Dukes and the Chief of Police as Sergeant Guy's supervisors, (*id*. at 67-68), but he did not testify that neither was on duty. Therefore, the record is inconclusive as to whether Sergeant Guy was the on duty patrol shift watch commander. If he was not, he could not have authorized Commins to participate in the pursuit.

Second, the policy requires that the officer's participation in the pursuit be "authorized" by the appropriate supervisor. The term is undefined, and Commins has offered no explanation of its reach. It is at least reasonable to construe the provision as requiring a verbal direction or assent, and there is no evidence that Sergeant Guy verbally authorized Commins to participate in the pursuit.[14]

Third, the policy appears to require that, in order to participate in a vehicle pursuit outside the City's corporate limits, the officer must have already joined the pursuit (with proper authorization) within the City's corporate limits.[15] But Commins has testified that he did not join the other pursuing vehicles until entering Interstate 65 at Exit 15. (Commins Deposition at 69-70). The Court

---

[14] There is evidence that Commins heard Guy call over the police radio that he was in pursuit, that Commins asked Guy where he was, that Guy said he was at Exit 19, and that Commins said "10-4." (Commins Deposition at 64-66). The two had no further communication before Commins joined the chase at Exit 15. (*Id*. at 69-70).

[15] The policy provides for an officer's pursuit outside the city limits only as a "continu[ance]," which indicates the officer must have joined the pursuit while "the pursuit remains within our corporate limits."

takes judicial notice that Exit 15 lies almost a mile beyond the City's corporate limits.[16]

Fourth, the policy requires that, in order to participate in a vehicle pursuit outside the City, the officer must receive fresh authorization from the appropriate supervisor. Just as Commins has no evidence that Sergeant Guy verbally authorized him to join the pursuit, he has no evidence that Guy verbally authorized him to engage in pursuit beyond the City's corporate limits.

As noted, Commins makes no effort to square his conduct with the Department's vehicle pursuit policy. Instead, he argues that any violation of the policy is irrelevant because the policy defines vehicle pursuit as "[a]n active attempt by one or more officers to apprehend a suspect operating a motor vehicle …," (Doc. 37, Exhibit 4 at 2), and because Baldwin and Jermaine had stopped operating a motor vehicle seconds before Commins struck Jermaine. (Doc. 41 at 2).[17] But Commins has not attempted to support the unlikely proposition that he had authority to effect a seizure in another jurisdiction immediately upon the conclusion of the unauthorized vehicle pursuit that took him there, especially when that seizure was effected by using his pursuit vehicle as a deadly weapon.[18]

---

[16] Commins testified that he "felt" as though he were part of the pursuit from the moment he got in his patrol car at his house (which appears to have occurred before the pursuit left the City). (Commins Deposition at 67). His feelings, of course, are not sufficient to establish the meaning of the policy. Because the policy speaks of becoming "directly involved" in the pursuit, it is doubtful that travel through town on the way to join the pursuing vehicles constitutes pursuit under the policy.

[17] According to the video evidence, Commins struck Jermaine within 15 seconds after the Baldwin vehicle stopped.

[18] Indeed, Commins' effort to draw a line of demarcation between the pursuit of Baldwin's vehicle and his striking of Jermaine, if accepted, would be independently fatal to his invocation of discretionary authority. This is so because Commins explicitly limits his assertion of discretionary authority to his actions "in pursuing the fleeing vehicle." (Doc. 29 at 11). If striking Jermaine immediately after he exited the fleeing vehicle was not part of Commins' pursuit of the fleeing vehicle, then Commins has not asserted discretionary authority as to the conduct for which he has been sued.

The Court does not rule that Commins could not meet his burden of showing that he acted within his discretionary authority.  The Court rules only that, given his off-duty status, his application of deadly force far from his home jurisdiction, and his apparent violations of the Department's vehicle pursuit policy, his mere non-evidentiary ipse dixit that he acted within his discretionary authority is inadequate to meet that burden.

Because Commins has not carried his threshold burden, the Court does not consider whether his conduct violated a clearly established constitutional right.  For the reasons set forth above, Commins is not entitled to summary judgment on the plaintiff's Fourth Amendment claim on the grounds of qualified immunity.

### B.  Other Constitutional Rights.

Count Three alleges that Commins' conduct violated Jermaine's rights to substantive due process, procedural due process, equal protection, free speech and petitioning the government.  (Doc. 2, Exhibit 80 at 903-04).  The Court considers these claims in turn.

### 1.  Substantive due process.

"Today we ... hold that all claims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."  *Graham*, 490 U.S. at 395.  As discussed in Part I.A.1, there is evidence that Commins struck Jermaine intentionally, in order to prevent his escape, and thus effected a seizure.  Under this construction of the evidence, the plaintiff can have no claim for deprivation of life without substantive due process.

But Commins offers two other explanations for his conduct:  (1) that he struck Jermaine by accident, because he didn't see him in time to avoid him; and (2) that he struck him intentionally, but for the purpose of avoiding hitting

Baldwin or Sergeant Guy rather than for the purpose of preventing Jermaine's escape. (Commins Deposition at 83, 86; Doc. 29 at 18). A properly functioning jury could accept either version, which would remove the case from the strictures of *Graham* and make possible a substantive due process claim. Commins makes no argument to the contrary. Instead, he argues that the plaintiff cannot prove he acted with the mental state required to support such a claim.

In *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), the plaintiff's decedent was a passenger on a motorcycle fleeing the police at high speeds. When the motorcycle tipped over during a high-speed turn, the defendant's pursuing patrol car struck the dismounted passenger, killing him. *Id.* at 837. The Court first held that no seizure had occurred, since the defendant had neither struck the passenger intentionally nor desired to arrest his movement by doing so. *Id.* at 844. Thus, a substantive due process claim was possible. *Id.* at 843-44.

The *Lewis* Court then explored the requirements for such a claim. "Since the time of our early explanations of due process, we have understood the core of the concept to be protection against arbitrary action." 523 U.S. at 845. Arbitrariness is a restrictive standard, and "[o]ur cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be arbitrary in the constitutional sense …." *Id.* at 846 (internal quotes omitted). Specifically, "for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *Id.* "Thus, in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 847 n.8.

The degree of culpability needed to shock the conscience depends on the context of the behavior. In the context of prison administration in a non-emergency context, where time and incentives exist for reflection before acting, deliberate indifference may be sufficiently egregious. 523 U.S. at 849, 851. But

"[d]eliberate indifference that shocks in one environment may not be so patently egregious in another …."  *Id*. at 850.  Thus, force applied in the context of a prison riot does not support a substantive due process claim unless it is applied "maliciously and sadistically for the very purpose of causing harm."  *Id*. at 852-53 (internal quotes omitted).

In the context of "a high-speed automobile chase aimed at apprehending a suspected offender," the *Lewis* Court held that "only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience."  523 U.S. at 836.  Commins argues there is no evidence that he acted with such a purpose.  (Doc. 29 at 15).  The Court is unable to agree.

Were the jury to find that Commins struck Jermaine unintentionally, as he sometimes argues, there would be no purpose to cause harm, and the plaintiff's substantive due process claim would fail.  Were the jury to find that Commins struck Jermaine intentionally but in order to avoid striking Baldwin and/or Sergeant Guy, as he sometimes claims, it is doubtful that he could be found to have acted with a purpose to cause harm or that such a Sophie's choice would shock the conscience at the constitutional level.

The evidence, however, supports another construction.  As noted, the video evidence and Commins' own testimony reflect that he saw Jermaine in time to avoid him but, rather than braking and/or swerving away from Jermaine, he accelerated and made a soft turn directly into Jermaine's path, ensuring a harmful collision.  Although Commins claims he struck Jermaine in order to avoid striking Sergeant Guy, the video evidence reflects that Guy had not exited his vehicle at the moment of collision.  And although Baldwin does appear in the video, running about six feet behind Jermaine, a properly functioning jury could find, from the video evidence and the experts' opinions, that Commins easily could have avoided both Jermaine and Baldwin by braking and/or making a hard turn.  Thus, the jury could find that Commins intentionally struck Jermaine, but neither to effect an

arrest nor to avoid striking Baldwin or Sergeant Guy.  The absence of any other reason for striking Jermaine would enable the jury to find that Commins struck Jermaine for the purpose of gratuitously harming him.

Commins offers no other argument in opposition to the plaintiff's claim that he deprived Jermaine of his life without substantive due process.  For the reasons set forth above, Commins is not entitled to summary judgment on this claim.

### 2.  Procedural due process.

In a two-sentence argument opposing this claim, Commins does no more than list the elements of such a claim[19] and note that "mere lack of due care on the part of a state official does not state a claim for Procedural Due Process."  (Doc. 29 at 15).  The evidence favorable to the plaintiff, of course, reflects much more than mere lack of due care.

As promised, the Court will not articulate or develop arguments on the parties' behalf.  On the single ground asserted, Commins is not entitled to summary judgment as to this claim.[20]

---

[19] "In this circuit, a § 1983 claim alleging a denial of procedural due process requires proof of three elements:  (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003).

[20] In his reply brief, Commins asserts that he must be granted summary judgment on this claim because the plaintiff offered no argument in opposition.  (Doc. 41 at 4-5 & 5 n.4).  The law is to the contrary.  "[T]he district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion."  *United States v. One Piece of Real Property*, 363 F.3d 1099, 1101 (11th Cir. 2004).  This statement constitutes a holding. *Trustees of Central Pension Fund v. Wolf Crane Service, Inc.*, 374 F.3d 1035, 1039 (11th Cir. 2004).

Commins insists his position that the plaintiff's silence is fatal is supported by this Court's decision in *Godfrey v. Nationwide Vinyl Siding & Home Improvement, LLC*, ___ F. Supp. 2d ___, 2012 WL 6569292 (S.D. Ala. 2012).  In fact, the Court said in *Godfrey* precisely what it says now:  "On summary judgment, the Court cannot 'fill in the blanks' to formulate a legal argument that a party has not."  *Id*. at *6.  Commins having presented

### 3. Equal Protection.

The Equal Protection Clause "prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996). Such a claim may be raised in the context of the use of force against a citizen. *E.g., McElroy v. City of Birmingham*, ___ F.Supp. 2d ___, 2012 WL 4711918 at *12, *22 (N.D. Ala. 2012). "To prove a claim based on a violation of the Equal Protection Clause of the Fourteenth Amendment, plaintiff must allege and prove that through state action, similarly situated persons have been treated disparately, and that [the defendant's] actions were motivated by race" or some other protected characteristic. *Id.* at *23 (internal quotes omitted); *accord Benton v. Roussean*, 2011 WL 5592859 at *3 (M.D. Fla. 2011).

As Commins correctly points out, (Doc. 29 at 13-14), the plaintiff has presented no evidence that Commins treated any similarly situated person more favorably than Jermaine, much less that he did so because of some protected characteristic. That lack of evidence is fatal.

Commins assumes that the plaintiff could proceed under a "class of one" theory. (Doc. 29 at 14 n.3). "To prevail on a 'class of one' equal protection claim, Plaintiffs must show they were intentionally treated differently from others who were 'similarly situated' and that there is no rational basis for the difference in treatment." *Grider*, 618 F.3d at 1263-64. Again, the plaintiff identifies no similarly situated person treated more favorably than Jermaine.

Count Three indicates that one aspect of the plaintiff's equal protection claim is that Commins' conduct precluded Jermaine from petitioning the government or seeking access to the courts on an equal basis. (Doc. 2, Exhibit 80 at 903-04). Here again, the plaintiff's failure to identify any similarly situated person treated more favorably dooms his claim.

---

no viable argument against the plaintiff's procedural due process claim, the Court will not do so for him.

For the reasons set forth above, Commins is entitled to summary judgment as to the plaintiff's equal protection claim.

### 4. Free speech/petitioning the government.

Count Three alleges that Jermaine "was denied the opportunity to petition the government for a redress of grievances, thereby … denying him free speech rights." (Doc. 2, Exhibit 80 at 903).  This peculiar claim apparently asserts that, by killing him, Commins kept Jermaine from seeking redress for Commins' conduct and from exercising the free speech that such a petition would have entailed.

Commins' only response to this claim is the assertion that "the civil rights of an individual die with that individual and there is no valid claim for inability to exercise civil rights subsequent to that individual's death." (Doc. 29 at 17).  The cases to which he cites, however, stand only for the proposition that, once someone is deceased, he is no longer a "person" under the Constitution or Section 1983, such that a defendant's conduct occurring after that death cannot support a claim in favor of the decedent.  *E.g., Whitehurst v. Wright*, 592 F.2d 834, 840 (5th Cir. 1979).  Commins' conduct, however, did not follow Jermaine's death but preceded it; thus, his cited authority is inapposite and does not support his motion.

Nor does it appear that Jermaine expired before his rights arising from Commins' conduct accrued.  Jermaine presumably had the right to seek redress for Commins' conduct (and to engage in free speech in support of such effort) from the instant Commins struck him, and Jermaine survived that impact by several hours.  (Doc. 27, Exhibit 8 at 11).

 As with the plaintiff's procedural due process claim, Commins has presented a single, unsupported argument.  As with that claim, the Court will not develop this argument or propose others that might carry more hope of success.

On the single ground asserted, Commins is not entitled to summary judgment as to this claim.[21]

## II.  State Claims.

Count Three includes, in addition to the federal constitutional claims discussed in Part I.B, several claims under the Alabama Constitution.  Count One asserts a claim of negligence and Count Two a claim for wrongful death.  (Doc. 2, Exhibit 80 at 901-04).

### A.  Commins.

Commins invokes discretionary function immunity as to the claims in Counts One and Two and the state claims in Count Three.  (Doc. 29 at 22, 27). The parties agree that this immunity, and the related peace officer immunity granted by Ala. Code § 6-5-338, is governed by the analysis set forth in *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000).  They also agree that Commins has met his initial burden of showing that, at the relevant time, he was a peace officer engaged in a function as to which the statute and the doctrine provide immunity.  (Doc. 29 at 25-25; Doc. 36 at 17-18).  The question thus becomes whether the plaintiff has presented evidence that Commins acted willfully, maliciously and/or beyond his authority so as to forfeit his immunity.  *Cranman*, 792 So. 2d at 405.[22]

As this Court has previously noted, "[f]or purposes of the immunity issue, 'willful,' 'malicious' and 'bad faith' all require evidence that the defendant acted with the intent to injure or with ill will towards the plaintiff."  *Lawrence v. City of Fairhope*, 2010 WL 1658786 at *13 (S.D. Ala. 2010).  Commins concurs.  (Doc.

---

[21] Commins repeats his position that the Court must grant him summary judgment because the plaintiff did not respond to his argument.  (Doc. 41 at 4-5 & 5 n.4).  As discussed in note 20, *supra*, this is not a valid ground for granting summary judgment.

[22] *Cranman* identifies other means of defeating immunity, but the plaintiff does not invoke them.  (Doc. 36 at 18).

29 at 26).  As discussed in Part I.B.3, the evidence would allow a properly
functioning jury to find that Commins harbored ill will and/or an intent to injure
Jermaine, untainted by any desire to prevent his escape or achieve any legitimate
objective.  Commins' denial of any such mental state, (*id*.), is inadequate to
eliminate this fact issue.  The evidence that Commins acted willfully and/or
maliciously precludes summary judgment with respect to all claims not based on
negligence or wantonness.[23]

"A State agent acts beyond authority and is therefore not immune when he
or she fails to discharge duties pursuant to detailed rules or regulations, such as
those stated on a checklist."  *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala.
2003) (internal quotes omitted).  The plaintiff argues that Commins' apparent
violations of the Department's vehicle pursuit policy satisfy this definition and
thus strip him of immunity.  (Doc. 36 at 18-22).

The Court assumes without deciding that the policy is mandatory and
sufficiently detailed to satisfy *Giambrone*, such that Commins' apparent violations
mean he acted beyond his authority in engaging in the pursuit of Baldwin's
vehicle.  The problem, as Commins points out, (Doc. 41 at 10-11), is that the
plaintiff is not suing him for his conduct in participating in a vehicle pursuit but
for his subsequent act of running over Jermaine.[24]  The plaintiff himself concedes
that Commins' violations of the vehicle pursuit policy are relevant to his state
claims only in that they "put [Commins] in the position where he ended up striking

---

[23] "This Court has previously held that poor judgment or wanton misconduct, an
aggravated form of negligence, does not rise to the level of willfulness and maliciousness
necessary to put the State agent beyond the immunity recognized in *Cranman*."  *Ex parte
Randall*, 971 So. 2d 652, 664 (Ala. 2007).

[24] "At that time, Jermaine Gaillard exited the passenger door and ran across the
road on foot whereupon officer Samuel Peter Commins … negligently or wantonly ran
over Jermaine Gaillard and did cause the wrongful death of Plaintiff's decedent, Mr.
Gaillard."  (Doc. 2, Exhibit 80 at 901).  Commins "did negligently operate his patrol car
… so as to strike and run over Jermaine Gaillard."  (*Id*. at 901-02).

Gaillard with his vehicle and killing him." (Doc. 36 at 22). As discussed in Part I.A.3, that may be a sufficiently close connection to impact Commins' discretionary authority, but it does not strip Commins of immunity for his alleged negligence and/or wantonness in striking Jermaine.

For the reasons set forth above, Commins is entitled to summary judgment with respect to Count One (which sounds only in negligence), Count Two to the extent it sounds in negligence or wantonness, and the state constitutional claims in Count Three, to the extent they sound in negligence or wantonness.

### B. The City.

Count Three alleges that the defendants' conduct violated Jermaine's rights under Article I, Sections 4, 6 and 13 of the Alabama Constitution. (Doc. 2, Exhibit 80 at 903-04). The plaintiff asserts these claims "[p]ursuant to 42 U.S.C. § 1983." (*Id.* at 903).[25] As noted, the plaintiff "concedes … that the claims brought against [the City] pursuant to §1983 are due to be dismissed." (Doc. 36 at 22). Since the plaintiff purports to bring his state constitutional claims pursuant to Section 1983, his concession extends to those claims. Accordingly, the City is entitled to summary judgment as to the state constitutional claims embedded in Count Three.

"It is well established that, if a municipal peace officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune." *Ex parte City of Montgomery*, 99 So. 3d 282, 298 (Ala. 2012) (internal quotes omitted). The plaintiff accepts this principle. (Doc. 36 at 22). The City is thus entitled to summary judgment on Count One, and on Count Two to the extent based on Commins' alleged negligence or wantonness.

---

[25] The plaintiff's invocation of Section 1983 appears misguided. "Section 1983 does not create a remedy for every wrong committed under the color of state law, but only for those that deprive a plaintiff of a federal right." *Knight v. Jacobson*, 300 F.3d 1272, 1276 (11th Cir. 2002). "While the violation of state law may (or may not) give rise to a state tort claim, it is not enough by itself to support a claim under section 1983." *Id.*

That leaves for consideration the plaintiff's claim under Count Two for wrongful death based on "willful[ness], malicious[ness] and/or inten[t]." (Doc. 2, Exhibit 80 at 902). Pursuant to statute, the City cannot be held liable for a person's injury "unless said injury or wrong was done or suffered through the neglect, carelessness or unskillfulness of some agent, officer or employee of the municipality engaged in work therefor and while acting in the line of his duty …." Ala. Code § 11-47-190. As the plaintiff concedes, (Doc. 36 at 22), this statute precludes municipal liability based on the willful, malicious or intentional misconduct of its agents, officers and employees.[26] The City has invoked its protection, (Doc. 25 at 19-20), and it requires judgment in the City's favor.

## CONCLUSION

For the reasons set forth above, the City's motion for summary judgment is **granted** in its entirety. Commins' motion for summary judgment is **granted** with respect to Count One; **granted** with respect to Count Two to the extent based on negligence or wantonness; **granted** with respect to the state constitutional claims embedded in Count Three to the extent based on negligence or wantonness; and **granted** with respect to the federal equal protection claim embedded in Count Three. In all other respects, Commins' motion for summary judgment is **denied**.

DONE and ORDERED this 25th day of March, 2013.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

[26] *E.g., Wheeler v. George*, 39 So. 3d 1061, 1085 (Ala. 2009) ("[A] municipality cannot be held liable for the intentional torts of its employees."); *Ex parte City of Tuskegee*, 932 So. 2d 895, 910 (Ala. 2005) ("Section 11-47-190 provides a municipality immunity from liability for the acts of its agents that are carried out in bad faith or with malice."); *Altmayer v. City of Daphne*, 613 So. 2d 366, 369 (Ala. 1993) (Section 11-47-190 "absolves a municipality from liability" for "claims alleging willful and reckless misrepresentation").